## George Barnett and Burnie Barnett v. Commonwealth.

### (Decided October 5, 1926.)

### Appeal from Magoffin Circuit Court.

1. Homicide.—In homicide case, instruction to find both defendants guilty if either of them aided or abetted the actual killing held erroneous; each defendant's guilt or innocence being dependent only on his own participation.
2. Criminal Law.—In homicide case, testimony that one defendant had said his codefendant and another did killing held incompetent for any purpose other than contradiction and improperly admitted.
3. Homicide—In Homicide Case Portion of Dying Declaration Held Inadmissible as Opinion of Declarant and as Vague and Indefinite.—Admission of dying declaration of deceased that particular man had killed him, but that "G. B. (one of defendants) was in the lead," held, as to the quoted language, inadmissible as conclusion or expression of opinion of declarant and as too vague and indifinite.
4. Homicide.—Mere conclusions or expressions of opinion on the part of declarant are inadmissible as dying declarations.

W. R. PRATER for appellants.

FRANK E. DAUGHERTY, Attorney General, A. FLOYD BYRD, Assistant Attorney General, and J. WOODFORD HOWARD, for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Reversing.

Clayton Clemmons and appellants, George and Burnie Barnett, were indicted for murder by the grand jury of Magoffin county. Appellants, the two Barnetts, father

and son, have been tried and found guilty of voluntary manslaughter and sentenced to confinement in the penitentiary for seven years. This is an appeal from the judgment so convicting them.

It appears that shortly after dark on a Sunday night in April, Ed Howard and Edgar Lykins, his son-in-law. started from the home of the former to go to the home of the latter, both riding mules. When they left Howard's home they had the choice of three ways that would take them to their destination. The public highway was the best, though it was somewhat the longest. One passway across certain hills would take them by and within 30 or 35 feet of the home of appellants, George and Burnie Barnett. Another passway across certain hills would have taken them to their destination without passing that home. The two passways across the hills are shown to have been about the same length and about alike in fitness for travel. Howard and Lykins chose that way which led by the home of the Barnetts. Some months previous to this time Jennings Barnett, another son of appellant, George Barnett, had killed a brother of Ed Howard. Lykins, testifying for the Commonwealth, after proceeding with the narrative to the point where he and Howard were approaching Barnett's home, testified: "We just came riding along and just as we got even with the house somebody hollered, 'Bat your eyes, June bug, God damn you, the world is for you.' " He stated that it seemed to be a man's voice and to come from the yard of the Barnett home. Immediately after hearing that battle cry, Lykins claims to have deserted his companion, abandoned the way he was traveling, to have pulled up two of the posts of a fence he encountered so as to be able to get through, to have ridden in a circuitous route through fields and woods approximately a quarter of a mile and again to have intercepted the passway that he and Howard had been traveling. He hitched his mule and proceeded afoot along the passway towards where he had left Howard, and had proceeded along it until within about 50 yards of George Barnett's barn, when he heard a fusillade of shots fired. He testified that the first two shots were fired from a shot gun, following which a number of shots were fired from revolvers, and that the last shot was fired from a shot gun. He estimated the number of shots in all at from 18 to 21. He testified that he heard nothing said by any of the parties to the difficulty, and

that he hurriedly retraced his steps to where he had
hitched his mule and unhitched it and rode to the home of
a kinsman, where about an hour and a half later he
learned that Ed Howard had been killed. Some four or
five witnesses for the Commonwealth testified that they
heard the shooting, and some of them stated that the first
two and last shots were fired from a shot gun, and that a
number of shots between were fired from pistols; others
noticed no difference in the sound of the shots; and all of
them estimated the number of shots at from fifteen to
twenty.

A witness or two for the Commonwealth testified that
immediately after the shooting they heard a woman
screaming and heard her say: "Lord have mercy, what
does this mean?" and heard a man respond, "Hush, ma,
none of us are hurt or killed." Not long after the shooting
ceased appellant, George Barnett, appeared at the home
of one of his close neighbors and requested that they go
and investigate to see what the result of the affray had
been. While there he borrowed a shot gun but had no
weapon when he came. The neighbors who went shortly
to the scene discovered Ed Howard mortally wounded
lying near the passway which runs by the Barnett home
and near a gate, and about half way between his residence
and his barn. Howard had a .38 special pistol in his
hand when found, which contained six empty cartridges.

Jim Whitt, a witness for the Commonwealth, testi-
fied as to statements made by Howard in the nature of
dying declarations, all of which appear to have been made
under that sense of impending dissolution and while *in
extremis* so as to render them competent as such. That
testimony appearing in the record is:

"Q. Tell all he said about it after he had made
the statement he was killed? A. About all there was
to it; he said Clayton Clemmons was the man who
killed him, but George Barnett was in the lead. Q.
Did he or not in that conversation make any state-
ment as to what he was doing and how it occurred?
A. No, sir, he did not. Q. What else did he say?
A. He didn't say very much about it in no way. Only
he said he was on the ground. Q. Did he say whether
he was riding? A. I asked him if he was on the
ground or on the mule and he says, 'I was on the
ground going to my mule or trying to get to it,' or
words to that amount. I won't state positive. Q.

Was that what he said he was doing when he was shot? A. Yes, sir.   Q. . Tell what he said with reference to him shooting?   A.   He said: 'When they shot I shot and done my best.'   Q.   He. didn't say who he meant by 'they?'   A.   No, sir, he didn't.''

The mortal wound appears to have been inflicted with a shot gun, fired at close range.  The charge of shot struck Howard in the abdomen and partially disemboweled him.  In addition a shot inflicted a flesh wound in the breast, one in the thigh and three or four in the back. The evidence is uncertain whether these wounds were made with a pistol or with a shot gun loaded with large shot.  Howard died about an hour after he was. shot.

The testimony for appellants is that late on the Sunday afternoon in question, Clayton Clemmons, jointly indicted with appellants, came to their home and remained for supper.  After supper George Barnett went to his woodyard about half way between his residence and barn and prepared stove wood for use in cooking breakfast the following morning.  He then called to Clayton Clemmons, who was in the house, that they would go and put up and feed his mule, which was hitched to the fence in front of the house.  George Barnett then went to the mule and unhitched it and started to the barn. At the time Clayton Clemmons was called for that purpose he was examining a shot gun belonging to George Barnett to see whether he would buy it, and stepped from the house with the gun in his hand to go with Barnett to feed his mule.  When George Barnett reached a gate about half way between his residence and his barn, through which it was necessary to pass, he observed a mule standing near saddled and bridled but with no one on it, and remarked to Clemmons, who had not yet caught up with him: "What does this mean? Here's a loose mule with a saddle on it." At that time Ed Howard raised up from behind a post which stood nearby, and, without saying anything, presented his pistol and began to shoot at Clayton Clemmons.  Someone else, unidentified by any of the witnesses, began shooting from an apple tree which stood nearby, and Clemmons returned the fire, using first the shotgun which he had and then a pistol, with which he was armed.  George Barnett testified that he was unarmed himself and that when the shooting began he turned the mule loose and ran.  Burnie Barnett and his mother and sister were in the residence when the

shooting began, but immediately ran out, and Burnie ran toward the place where the shooting was done. Mrs. Barnett was screaming and wailing for fear her husband or son had been or would be killed. The shooting was quickly over and George Barnett, turning again toward his residence, met Burnie Barnett in the woodyard, whereupon Burnie called to his mother to cease screaming as none of them were hurt. Burnie Barnett had no weapon of any kind and took no part in the shooting. After it ceased he observed Clayton Clemmons walk to the fence along the road between the house and the barn and set the shot gun down that he had been using and immediately turn and leave. He appears to have left the jurisdiction of the court and has never been apprehended.

Rosella Whitt, a daughter of one and sister of the other appellant, was present and heard Ed Howord's dying statement to Jim Whitt. Her testimony is:

"Q. Did you hear Ed Howard say anything about whether he was killed or not? A. Yes, sir, he said he was killed. Q. After that what other statement did he make, if any, with reference to the trouble? A. He asked for his father and they called and told him his father was in Breathitt and he said, 'Don't tell me that,' and he asked for a doctor and said, 'There is no use,' and to call the sheriff, he wanted to tell who killed him, and Jim Whitt said, 'Tell me,' and he said, 'Clayton Clemmons.' Q. Did you hear him make any other statement? A. He said he went up there to kill—saddled his mule and went up there to kill but they got him first. Q. Did he say anything else? A. Jim Whitt asked him if he was on his mule and says, 'Did you shoot?' and he says, 'I shot my pistol empty—I done my best.' "

Jesse Manns, a youth 13 years of age, stated that he heard this much of the statement: "I saddled my mule and went to kill them but they got me first."

It further appears that Jennings Barnett, who had killed Howard's brother, had been indicted, was at liberty on bond, had been away from home for some time but was expected back that night for his trial set for a day or two later. Clemmons was wearing a large white hat like Jennings Barnett was accustomed to wear.

Under these facts it is the theory of the Commonwealth that the previous homicide and the prosecution of Jennings Barnett by the Howards for it was the motive

that led the Barnetts to kill Ed Howard; that they heard Lykins and Howard approaching their home on the night in question; and that the Barnetts and Clemmons lay in wait and put into execution their previously formed determination to kill Ed Howard.

It is the theory of the defendants that Jennings Barnett's killing of Smith Howard furnished Ed Howard the motive for desiring to avenge that death by killing Jennings Barnett; that knowing of his approaching trial on the murder charge and expecting him to return home on this night, Howard and Lykins went to the home of the Barnetts and lay in wait for an opportunity to kill Jennings Barnett; that when Clayton Clemmons left the residence to go with George to feed the mule he was mistaken for Jennings Barnett by Howard and Lykins and they opened fire on him, which was returned by Clemmons and which resulted in the death of Ed Howard. They insist that there is no evidence that either George or Burnie Barnett took part in the shooting or the affray that led to the death of Ed Howard either as principals or as aiders and abettors.

The Commonwealth and the defendants each insist that under the facts hereof their theory is sustained, the former insisting that the verdict of the jury is abundantly sustained by the evidence, and the latter that the verdict of the jury is flagrantly against the evidence.

A careful analysis of the facts hereof leads unquestionably to the conclusion that the preponderance of the evidence sustains the theory of the defendants; but in view of the fact that other errors appearing in the record make it necessary to reverse the judgment, we have concluded that we will not pass upon the question as to whether or not the verdict of the jury is flagrantly against the evidence.

By instruction No. 2 the court directed that if the jury should believe from the evidence beyond a reasonable doubt "that E. Howard was unlawfully, etc., . . . shot and killed by Clayton Clemmons, George Barnett or Burnie Barnett when it was not necessary, etc., . . . and that the defendants, George Barnett or Burnie Barnett, were present at the time and did unlawfully, willfully and feloniously aid, abet, advise, counsel or encourage the said Clayton Clemmons or the one of them who did said killing they should find the defendants, George Barnett and Burnie Barnett, guilty, etc. .. .. .. " It

will be observed that this instruction expressly directs
the jury to find both appellants guilty if either of them
aided or abetted Clayton Clemmons to kill Ed Howard
under such circumstances as would require the homicide
to be found to be either murder or manslaughter. Under
the facts of this case that instruction clearly was errone-
ous and prejudicial and the error can not be said to have
been cured by the reasonable doubt instruction, which
reads: "The jury are further instructed that the defend-
ants are presumed to be innocent of any offense, and this
presumption of his or their innocence entitles them to an
acquittal at your hands unless his or their guilt has been
proved from the evidence beyond a reasonable doubt."
Instruction No. 1, which submitted to the jury the ques-
tion of the guilt or innocence of the defendants as prin-
cipals, is subject to the same criticism, though it is pos-
sible that by the concluding clause of the instruction the
jury was sufficiently informed that they might find one
of the defendants guilty and the other not guilty. Upon
another trial both instructions will be so worded as not
to be subject to the criticism that they are misleading and
that the jury may clearly understand that the guilt or
innocence of each of the defendants depends upon his own
participation in the homicide and that neither of them
can be convicted for what the other did.

Over appellant's objection Solomon Manns, a wit-
ness for the Commonwealth, was permitted to testify that
on the day after Ed Howard was killed appellant, George
Barnett, stated to him that Burnie Barnett (appellant)
and Clayton Clemmons had killed Ed Howard. By his
testimony, especially his cross-examination, George Bar-
nett makes it clear that he did not see his son, Burnie
Barnett, at any time during the affray, and his testimony
does not amount to a statement that his son did no shoot-
ing and took no part in the affray. The evidence for ap-
pellant, Burnie Barnett, that he was not present, did no
shooting, and took no part in the killing of Ed Howard
came from himself and his mother and sister. George
Barnett's testimony was confined to an account of what
he himself did immediately before and during the prog-
ress of and immediately following the shooting. There-
fore, to permit proof that on the day following Ed
Howard's death George Barnett stated that Burnie Bar-
nett and Clayton Clemmons killed Ed Howard is not a
contradiction of the testimony of George Barnett while

a witness herein. That statement certainly could not have been competent for any other purpose than to contradict the testimony of Barnett. It is not pretended that Burnie Barnett was present and heard the statement. If the statement had been competent as a contradiction of the testimony of George Barnett, in view of its incompetency and prejudicial nature as substantive evidence against defendant, Burnie Barnett, the trial court should have admonished the jury that it was not competent as substantive evidence of Burnie Barnett's guilt or innocence, but was competent only to affect the credibility of the testimony of George Barnett, if it did so, and for no other purpose. No such admonition appears in the record. We conclude under the facts of this case that the evidence was not competent for any purpose and failure to admonish the jury as indicated certainly was erroneous. That it was prejudicial can not be doubted.

In will be observed that in deceased's dying declaration, as proved by the Commonwealth, he stated that Clayton Clemmons had killed him, "but George Barnett was in the lead." In 30 C. J. page 277, section 4515, with reference to dying declarations, this rule is written:

"All vague and indefinite expressions which do not point distinctly to the *res gestae* of the fatal occurrence, but require a resort to inference or supposition to establish facts tending to incriminate the accused, should be excluded."

Among the opinions supporting that text is that of Luby v. Commonwealth, from this court, 12 Bush 1, where it was written that expressions standing alone and wholly unexplained which are too vague and indefinite to amount to evidence should not be permitted to go to the jury as part of a deceased's dying declaration. Here the statement "George Barnett was in the lead" stands wholly unexplained. What he meant by it can be arrived at only by speculation and supposition. Deceased made no statement of fact as to anything said or done by George Barnett, and we are constrained to hold that the statement quoted which stands alone and is wholly unexplained by anything else that declarant said is too vague and indefinite to amount to evidence. In addition the rule is well established in this jurisdiction that mere conclusions or expressions of opinion on the part of the declarant are not admissible as dying declarations. We

can not escape the conclusion that if the statement quoted was sufficiently definite to take it out of the rule above, it is not the statement of a fact but merely a conclusion or the expression of declarant's opinion. What the facts were upon which he based the opinion or conclusion do not appear. The late case of Alton Mann v. Commonwealth, decided September 28, 1926, discusses this latter rule and the reasons therefor and cites our opinions upholding it. For these reasons the court has concluded that the quoted portion of deceased's dying declaration should not be permitted to go to the jury.

For the reasons indicated, the judgment herein is reversed and the cause remanded, with direction that appellants be granted a new trial and for other proceedings not inconsistent herewith.